No. 13-1717

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

───────────────

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION; RONALD STRAIT; DANNY O. STEVENS,

*Plaintiffs – Appellees,*

v.

KELSEY-HAYES COMPANY; TRW AUTOMOTIVE INC.; TRW AUTOMOTIVE HOLDINGS CORP.,

*Defendants – Appellants,*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION
District Court Case No. 11-CV-15497

───────────────

## DEFENDANTS-APPELLANTS' OPENING BRIEF

───────────────

GREGORY V. MERSOL (0030838)
GMERSOL@BAKERLAW.COM
TODD A. DAWSON (0070276)
TDAWSON@BAKERLAW.COM
BAKER & HOSTETLER LLP
3200 PNC Center
1900 East Ninth Street
Cleveland, Ohio 44114-3485
Telephone: (216) 621-0200
Facsimile:   (216) 696-0740

*Attorneys for Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

**A.      Kelsey-Hayes Company.**

LucasVarity Automotive Holding Company is the parent corporation of Kelsey-Hayes Company.  LucasVarity Automotive Holding Company is a wholly-owned subsidiary of TRW Automotive Inc., which is a subsidiary of TRW Automotive Holdings Corp., a publicly held corporation.

**B.      TRW Automotive Inc.**

TRW Automotive Inc. is a subsidiary of TRW Automotive Holdings Corp., a publicly held corporation.

**C.      TRW Automotive Holdings Corp.**

TRW Automotive Holdings Corp. is a publicly held corporation and there is no publicly held corporation or corporate parent that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

I.    STATEMENT REGARDING ORAL ARGUMENT ...................................1

II.   STATEMENT OF JURISDICTION .................................................2

    A.    Basis For District Court Jurisdiction.....................................2

    B.    Basis For Appellate Court Jurisdiction.................................2

III.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.................4

IV.   STATEMENT OF THE CASE .....................................................6

    A.    Nature Of The Case. ......................................................6

    B.    Course Of Proceedings....................................................6

    C.    Disposition Below. ........................................................7

V.    STATEMENT OF FACTS .........................................................9

    A.    Relevant Parties and Entities............................................9

    B.    Retiree Insurance And Relevant Contract Language. ...........10

        1.    The Supplement C-1 Insurance Program....................10

        2.    The Supplement C Agreement. ...............................13

    C.    Jackson Plant Closing And Termination Of The CBA.........15

    D.    Post-Closing Changes In Retiree Health Insurance.............16

    E.    Medicare Changes.........................................................17

    F.    Kelsey-Hayes' Implementation Of The HRA Program.........18

        1.    The HRA Structure. ...........................................18

        2.    The HRA Enrollment Process..................................19

        3.    The HRA Reimbursement Process.............................21

    G.    The District Court Proceedings. ......................................22

        1.    Kelsey-Hayes' Motion To Compel Arbitration. ...........22

        2.    Plaintiffs' Evidence.............................................22

        3.    The Parties' Cross-Motions for Summary Judgment.................23

        4.    The District Court's Summary Judgment Award. .....................24

5.      The District Court's Order Granting Plaintiffs' Post-Judgment Motion For A Preliminary Injunction.......................26

6.      The District Court's Order Granting Attorneys' Fees...............27

VI.    SUMMARY OF ARGUMENTS ...................................................29

VII.   APPLICABLE STANDARDS OF REVIEW .............................31

A.     The District Court's Summary Judgment Award................................31

B.     The District Court's Award Of Attorneys' Fees................................31

VIII.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR....................................................32

A.     The District Court Erred In Finding That The TRW Defendants Were Proper Parties...........................................................33

B.     The District Court Erred In Finding That Collateral Estoppel Barred Defendants From Implementing The HRA Structure Under The Jackson CBA. ....................................................34

C.     The District Court's Finding On Vested Benefits Was Not A Proper Basis For Declining To Apply *Reese II*....................................37

D.     The District Court's Restrictive Reading Of *Reese II* Does Not Support Summary Judgment In Plaintiffs' Favor. ...............................39

1.     Kelsey-Hayes' Alleged Duty To Bargain Does Not Preclude *Reese II*'s Application. ..................................................39

2.     Judicial Estoppel Principles Undermine The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes. ..........40

3.     The CBA's Expiration Undermines The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes. .................41

4.     Plaintiffs' Deposition Testimony Undermines The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes....................................................42

5.     The Parties' History Of Unilateral Changes Undermines The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes....................................................43

IX.    THE DISTRICT COURT ERRED IN DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.................................................44

X.    THE DISTRICT COURT ERRED IN GRANTING PLAINTIFFS'
      POST-JUDGMENT MOTION FOR A PERMANENT
      INJUNCTION. ...........................................................................47

XI.   THE DISTRICT COURT ERRED IN GRANTING PLAINTIFFS'
      MOTION FOR ATTORNEYS' FEES WITHOUT IMPOSING A
      SIGNIFICANT REDUCTION. ..................................................51

      A.    District Courts May Only Award Reasonable Fees. ............................52

      B.    The District Court Erred By Applying Only A 10% Reduction To
            The Attorney Hours Claimed By Class Counsel...................................54

XII.  CONCLUSION ..........................................................................59

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Air Prod. Chemicals, Inc.,*
    300 F.3d 667 (6th Cir. 2002) ................................................................ 32, 36, 42, 41

*Binta v. Gordon,* 2013 U.S. App. LEXIS 5432 (6th Cir. 2013) ......................................... 55

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................ 31, 42

*Gaeth v. Hartford Life Ins. Co.,* 538 F.3d 524 (6th Cir. 2008) ............................................. 31

*Golden v. Kelsey-Hayes Co.,* 954 F. Supp. 1173 (E.D. Mich. 1997) ....... 4, 25, 34, 35, 36, 37

*Grant v. Shaw Environmental, Inc.,* 2013 U.S Dist. LEXIS 49180
    (E.D. Tenn. Jan 30, 2013) ................................................................... 58

*Hammer v. INS,* 195 F.3d 836 (6th Cir. 1999) ........................................................... 35Kell

*Hargrove v. Eaglepicher Corp.,* 852 F. Supp. 851 (E.D. Mich., Apr. 4, 2012) ..................... 55

*Hensley v. Eckerhart,* 461 U.S. 424 (1983) ............................................................. 52

*Isabel v. City of* Memphis, 404 F.3d 404 (6th Cir. 2005) .................................................. 53

*J4 Promotions, Inc. v. Splash Dogs, LLC,* 2010 U.S. Dist. LEXIS 60590
    (S.D. Ohio May 25, 2010) ................................................................... 55

*Klepper v. First Am. Bank,* 916 F.2d 337 (6th Cir. 1990) ............................................. 31, 42

*Ky. Rest. Concepts Inc. v. City of Louisville,* 117 Fed. Appx. 415
    (6th Cir. 2004) ........................................................................... 53

*Logan v. Denny's Inc.,* 259 F.3d 558 (6th Cir. 2001) .................................................... 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ....................... 31, 42

*Missouri v. Jenkins,* 491 U.S. 274 (1989) ............................................................... 57

*Williams v. Kentucky,* 1997 U.S. App. LEXIS 23939 (6th Cir. 1997) ................................ 57

*Moore v. Menasha Corp.,* 2013 U.S. Dist. LEXIS 10126
    (E.D. Mich. Jan. 25, 2013) ............................................................. 53, 58

*Paschal v. Flagstar Bank, FSB,* 297 F.3d 431 (6th Cir. 2002) ......................................... 53

*Reed v. Country Miss, Inc.,* 1995 U.S. App. LEXIS 14498 (6th Cir. 1995) ...................... 53, 56

*Reese v. CNH Am. LLC,* 694 F.3d 681 (6th Cir. 2012) ............................................. passim

*Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009)........................................ 38

*Schreiber v. Philips Display Components Co.*, 580 F.3d 355 (6th Cir. 2009).......................... 36

*Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355 (6th Cir. 2009) ..... 31

*Sprague v. General Motors*, 133 F.3d 388 (6th Cir.), *cert. denied*, 524 U.S. 923 (1998)........ 32

*Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214 (6th Cir. 1990)............................................. 40

*UAW v. Yardman Inc.*, 716 F.2d 1476 (6th Cir. 1983),
    *cert. denied*, 465 U.S. 1007 (1984) ................................................................... 32, 37

*Voyk v. Brotherhood of Locomotive Eng'rs*, 198 F.3d 599 (6th Cir. 2000)............................ 32

## Statutes

1395j-1395w5 .................................................................................................. 18

28 U.S.C. § 1331 .............................................................................................. 2

29 U.S.C. § 1291 .............................................................................................. 3

29 U.S.C. § 185................................................................................................ 2

29 U.S.C. § 1132(a)(1)(B) ............................................................................... 5

29 U.S.C. § 1132(a)(a)(3) ................................................................................ 5

29 U.S.C. § 1132(e)(1) ..................................................................................... 5

29 U.S.C. § 1132(f) .......................................................................................... 5

42 U.S.C. § 1395s5 .......................................................................................... 17

42 U.S.C. § 1395w-101..................................................................................... 17

42 U.S.C. §§ 1395c-1395i5............................................................................... 17

FED. R. CIV. P. 56 (C)..................................................................................... 31

FED. R. CIV. PRO. 30(B)(6) ............................................................................ 23

FED. R. APP. PRO. 4(A)(1)(A) ....................................................................... 4

## Regulations

42 C.F.R. part 403............................................................................................ 17

## I.    __STATEMENT REGARDING ORAL ARGUMENT__

Appellants Kelsey-Hayes Company, TRW Automotive Inc., and TRW Automotive Holdings Corp. request oral argument in this matter. As explained below, defendant Kelsey-Hayes Company made certain changes in the manner of delivery of health insurance benefits to its retirees. Rather than determining whether these changes were permissible under the reasonableness analysis set forth by this Court in *Reese v. CNH Am. LLC*, 694 F.3d 681 (6th Cir. 2012) ("*Reese II*"), the District Court found that such changes were *per se* unlawful because the retirees' benefits were vested. This case will accordingly provide the Court with an opportunity to offer further guidance on *Reese II*'s application.

This case presents an additional question regarding the District Court's award of attorneys' fees. The District Court agreed with defendants that opposing counsel's fee demand was excessive. Yet, the District Court largely ignored this finding in rendering its fee award. In addition, the District Court ignored the other arguments that defendants presented, and offered no opinion on their merits.

Both of these issues, as well as the other issues presented in this case, can be developed more fully if addressed in oral argument.

## II.   STATEMENT OF JURISDICTION

### A.   Basis For District Court Jurisdiction.

Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the Union") and individual plaintiffs Ronald Strait and Danny O. Stevens asserted federal claims under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 ("Section 301"), and under Sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). The District Court therefore had federal question jurisdiction over the lawsuit under 28 U.S.C. § 1331.  The District Court also had jurisdiction over plaintiffs' ERISA claim under 29 U.S.C. §§ 1132(e)(1) and (f).

### B.   Basis For Appellate Court Jurisdiction.

Judge Gershwin Drain of the United States District Court for the Eastern District of Michigan (the "District Court") granted plaintiffs' motion for summary judgment on April 24, 2013, and entered judgment in their favor.  (Doc. 47, Plaintiffs' Motion for Summary Judgment; Doc. 65, Opinion and Order).  On May 23, 2013, defendants timely filed their notice of appeal in regard to this Order. (Doc. 80).

Following the District Court's summary judgment order, plaintiffs filed motions for attorneys' fees and for a permanent injunction.  (Doc. 69, Motion for Permanent Injunction; Doc. 70, Motion for Attorney Fees). The District Court granted plaintiffs' motion for a permanent injunction on June 5, 2013 and their

motion for attorneys' fees on June 12th. (Doc. 82, Order Granting Motion for Permanent Injunction; Doc. 83, Order Granting In Part Plaintiffs' Motion for Attorney Fees). Defendants filed a timely, amended notice of appeal in regard to these matters on June 13, 2013. (Doc. 84).

The Orders from which defendants have appealed are all final, appealable orders under 29 U.S.C. § 1291. Moreover, as set forth above, defendants' notices of appeal in regard to these Orders were timely under Federal Rule of Appellate Procedure 4(a)(1)(A). Accordingly, this Court has proper appellate jurisdiction.

### III.  <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.      Whether the District Court erred in finding that defendant Kelsey-Hayes Company unlawfully changed its method of providing retiree health insurance benefits, despite the fact that such benefits remain fully funded by Kelsey-Hayes and no retiree suffered any actual, out-of-pocket cost.

2.      Whether the District Court erred by failing to apply the analysis required by this Court in *Reese II*, supra, in determining whether the insurance changes at issue in this case were lawful.

3.      Whether the District Court erred in applying principles of issue preclusion and/or collateral estoppel derived from *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173 (E.D. Mich. 1997).

4.      Whether the District Court erred in finding that the *Reese II* analysis was supplanted by principles of issue preclusion and/or collateral estoppel.

5.      Whether the District Court erred in granting summary judgment against defendants given plaintiffs' failure to produce any evidence to show that the health insurance changes at issue in this case were unreasonable under the *Reese II* analysis.

6.      Whether, given plaintiffs' failure to produce any evidence to show that the health insurance changes at issue in this case were unreasonable under the *Reese II* analysis, the District Court erred in denying the TRW entities' motion for summary judgment.

7.      Whether the District Court erred in denying the TRW entities' motion for summary judgment in light of undisputed evidence demonstrating that each of the factors this Court set forth in *Reese II* favored the new delivery structure that Kelsey-Hayes implemented.

8.      Whether the District Court's injunction against "all" future changes is improperly overbroad.

9.      Whether the District Court erred in awarding attorneys' fees to plaintiffs.

10.     Whether the District Court erred in failing to properly reduce the amount of attorneys' fees it awarded based on its holding that the fees requested by plaintiffs were excessive and included amounts not properly awardable.

11.     Whether the District Court erred in granting summary judgment and attorneys' fees against TRW Automotive Inc., and TRW Automotive Holdings Corp. given the lack of any evidence that either entity had any contractual or statutory duty to provide retiree health insurance to plaintiffs.

IV.   **STATEMENT OF THE CASE**

A.    **Nature Of The Case.**

This case arises out of changes in the manner in which Kelsey-Hayes provided fully funded retiree healthcare insurance.  Specifically, rather than forcing retirees to accept a single, group health insurance plan, Kelsey-Hayes provided retirees with a mechanism to choose among an array of individual plans without exclusions that equaled or exceeded their prior coverage and ample funding to pay those and other costs.

B.    **Course Of Proceedings.**

On December 15, 2011, plaintiffs filed a Complaint claiming that these changes violated an expired collective bargaining agreement between Kelsey-Hayes and the Union (the "CBA").  (Doc. 1, Pg ID 1-2, Complaint).  Defendants filed a motion to compel arbitration on the basis that the CBA required such disputes to be arbitrated. (Doc. 13, Motion to Compel Arbitration).  The District Court, however, denied defendants' motion.  (Doc. 20, Order Denying Motion to Compel Arbitration).

Following discovery, plaintiffs moved for certification of the following class:

> All persons who retired or terminated from the union-represented collective bargaining unit at the Kelsey-Hayes plant in Jackson, Michigan under the 1995, 1999, and 2003 collective bargaining agreements and the retirees' and terminating employees' surviving spouses and other dependents eligible for company-paid retirement healthcare, including all (1) pension-eligible retired employees; (2) pension-ineligible employees "terminating at age 65 or older" not discharged "for cause"; (3) the

> surviving spouses of the retired and "terminating"
> employees; and (4) the "eligible dependents" of the retirees,
> "terminating" employees, and surviving spouses.

(Doc. 31, Motion to Certify Class By All Plaintiffs). Defendants did not contest certification of plaintiffs' proposed class in regard to liability. However, defendants did suggest that the District Court limit class certification initially to the issue of whether the CBA had been violated. (Doc. 36, Response to Motion to Certify Class). The District Court disregarded this measured approach and granted plaintiffs' motion in its entirety.[1] (Doc. 58, Opinion and Order Granting Plaintiffs' Motion for Class Certification).

### C.    Disposition Below.

The parties subsequently moved for summary judgment following discovery. (Doc. 37, Defendants' Motion for Summary Judgment; Doc. 47, Plaintiffs' Motion for Summary Judgment). The District Court denied defendants' motion, and granted summary judgment in favor of the class. The District Court's decision was based on its finding that class members purportedly had a vested right to unalterable health insurance. (Doc. 65, Opinion and Order).

After the District Court granted summary judgment, plaintiffs moved for a permanent injunction that they characterized as necessary to "give effect" to the

---

[1] Except where otherwise noted, the term "plaintiffs" will be used herein to refer collectively to the named plaintiffs and the absent class members.

District Court's order. (Doc. 69, Motion for Permanent Injunction). Defendants opposed this motion on the grounds that it was overbroad and purported to expand the District Court's judgment to include matters that were not presented in the case. (Doc. 77, Response to Motion for Permanent Injunction). The District Court issued an order on June 5, 2013, granting plaintiffs' motion in part and denying it in part. (Doc. 82, Order Granting Motion for Permanent Injunction).

In addition, class counsel moved for attorneys' fees in the amount of $595,500 following the District Court's summary judgment award. (Doc. 70, Motion for Attorney Fees). Defendants opposed the motion on multiple grounds. (Doc. 76, Response to Motion for Attorney Fees). The District Court granted plaintiffs' motion, and applied only a 10% reduction to the hours recorded by two attorneys on the case. (Doc. 83, Order Granting in part Class Representatives' Post-Judgment Motion for Attorney Fees and Expenses). In awarding these fees, the District Court addressed only one of the arguments defendants raised in opposing plaintiffs' motion (*i.e.*, that the hours were excessive), and agreed that it had merit.

## V.    STATEMENT OF FACTS

### A.    Relevant Parties and Entities.

The Jackson, Michigan plant from which this case arose manufactured automotive brake systems until it closed in July 2006. (Doc. 37-2, ¶ 7, Pg ID 1436, Declaration of Shelly Iacobelli). The Union, after merging with other unions in the 1990's, represented the production and maintenance workers at the Jackson facility. (*Id*.). TRW Inc. (which is not a party to this case) was the ultimate parent corporation of Kelsey-Hayes from 1999 until 2002, when TRW Inc. ceased operation. (*Id.* ¶ 19, Pg ID 1438).

Defendant TRW Automotive Holdings Corporation ("Holdings") is the present-day ultimate parent entity of Kelsey-Hayes that first went public in 2004. (Doc. 37-2, ¶ 18, Pg ID 1438, Declaration of Shelly Iacobelli). There is no evidence of any historical relationship with or continuity from the prior, now-defunct TRW Inc. Defendant TRW Automotive Inc. is a wholly owned-subsidiary of Holdings. (*Id.* ¶ 19, Pg ID 1438).

Plaintiff Strait worked for Kelsey-Hayes at the Jackson plant from January 3, 1966 until he retired in July, 1999. (Doc. 37-10, Pg ID 1937, Deposition of Ronald Strait). Plaintiff Stevens worked at the Jackson plant from September 12, 1966 until his retirement on March 1, 1999. (Doc. 37-8, Pg ID 1970, Deposition of Danny O. Stevens). Both plaintiffs retired under the collective bargaining that went into effect on February 10, 1999. (Doc. 37-7, Pg ID 1937, Deposition of Ronald Strait; Doc. 37-

8, Pg ID 1970, Deposition of Danny O. Stevens). Neither of the TRW defendants was even in existence at that time.

**B.    Retiree Insurance And Relevant Contract Language.**

The Jackson employees were covered by a series of collective bargaining agreements ("CBAs"), the last of which was negotiated in 2003. (Doc. 37-2, ¶ 7, Pg ID 1434, Declaration of Shelly Iacobelli). Though incorporated into the various CBAs over the years, the insurance benefits negotiated for the bargaining unit were separately governed by two interrelated documents referred to as "Supplement C" and "Supplement C-1." (*Id.;* Doc. 37-7, Supplement C and Supplement C-1).

**1.    The Supplement C-1 Insurance Program.**

Supplement C-1 was largely a benefits schedule describing the various insurance coverages available to bargaining unit members and retirees, such as life, sickness and accident, health care, and other such benefits. (Doc. 37-7, Supplement C and Supplement C-1). While this coverage was comprehensive, retirees still experienced some out-of-pocket costs. For example, lifestyle drugs (*i.e.*, Viagra) and premium medical products (*i.e.*, wheelchairs and hearing aids) were not covered. (Doc. 37-2, ¶ 11, Pg ID 1436, Declaration of Shelly Iacobelli). Routine office visits were also excluded from Supplement C-1's schedule of required benefits. (*Id.*). Moreover, Medicare-eligible retirees paid their Medicare Part B premiums out-of-pocket. (Doc. 36-2, ¶ 13, Pg ID 910, Declaration of Shelly Iacobelli).

While Supplement C-1 covered retirees, Kelsey-Hayes retained flexibility to modify their benefits.  (Doc. 37-8, Pg ID 1898, Supplement C and Supplement C-1). Retiree coverage was referenced in Supplement C-1, Article II, Subsection (b)(7)-(8):

> **Section 3(b)(7).    For Retired Employees and Certain Former Employees**
>
> The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5, for:
>
> (i) A retired employee and his eligible dependents . . . provided such retired employee is eligible for benefits under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan . . .

> **Section 3(b)(8).  For Surviving Spouses**
>
> (i) The Company shall contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 6(b) on behalf of a surviving spouse . . . and the eligible dependents of any such surviving spouse . . .

(*Id.* at Pg ID 1879).  Article III, Section 5, in turn, described retiree benefits in terms of *coverage*, and did not require any particular plan or structure in which this coverage had to be provided:

> **Article III, Section 5.   Continuance of Health Care Coverages Upon Retirement or Termination of Employment at 65 or Older**
>
> (a)  The health care coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle the employee to a benefit under Article II of the Kelsey-Hayes Hourly-Rate Employees Pension Plan shall be continued thereafter provided that suitable arrangements for such continuation, can be made with the carrier(s).  Contributions for such coverages so continued shall be in accordance with Article I, Section 3(b)(7).

(*Id.* at Pg ID 1901).   In fact, Article I, Section 5, Subsection (h) specifically acknowledged Kelsey-Hayes' right to change the "arrangement" through which insurance coverages were delivered:

> **ARTICLE III**
> **HEALTH CARE BENEFITS**
>
> **Section 1.  Establishment of Health Care Coverages**
>
> (h) Replacement or Supplementation of Plan Coverages
>
> If, in its judgment the Company considers it advisable in the interest of the employees, another arrangement may be substituted for all or part of the coverages referred to in subsection (a) above.

(*Id.* at Pg ID 1848).  Supplement C-1 also included a provision allowing Kelsey-Hayes to modify or reduce benefits in the event that any federal health care program was enacted or amended:

**ARTICLE I**

**ESTABLISHMENT, FINANCING AND ADMINISTRATION OF INSURANCE PROGRAM**

. . . .

**Section 5.    Federal Health Care Benefits**

(a) Not Applicable to Employees or Former Employees Eligible for Such Benefits

The provisions of the Program pertaining to health care benefits, separately or in combination, shall not be applicable to employees, former employees (including retired employees), or surviving spouses who are or may become eligible for health care benefits under any Federal Health Security Act or any other law providing such benefits for the public at large which may be amended or enacted.
. . . .

(c) Reduction of Health Care Benefits Because of Benefits Under Federal Law

Health care benefits separately or in combination, provided employees, former employees (including retired employees) or surviving spouses under Article III may be reduced by the amount of such benefits provided under any Federal Health Security Act or any other law which may be amended or enacted.

(*Id.* at Pg ID 1880-81).

## 2.    The Supplement C Agreement.

Unlike Supplement C-1, Supplement C did not provide a specific schedule of benefits.  Instead, it adopted the Supplement C-1 schedule into a formal agreement between Kelsey-Hayes and the Union. Specifically, Supplement C provided a

commitment from Kelsey-Hayes to provide the benefits described in Supplement C-1 or, if such benefits proved impractical, to negotiate with the Union for a substitute benefits package:

> **Section 1.   Establishment of Program**
>
> In the event the initiation of any benefit or benefits described in Article III of the Program [*i.e.*, Supplement C-1] does not prove practicable or is not permitted by the plans under which coverages provided on the dates stipulated in such Article III, the Company in agreement with the Union will provide new benefits and/or coverages as closely related as possible and of equivalent value to those not provided.

(Doc. 37-8, Pg ID 1873, Supplement C and Supplement C-1).

Kelsey-Hayes further agreed in Supplement C to limit the modification rights established in Supplement C-1.   In particular, the Company agreed that it would exercise these rights only with the Union's consent.   For example:

> **Section 3.  Company Options**
>
> (a) The options afforded the Company to provide a plan of benefits supplementary to state plan benefits or to substitute a private plan of benefits for state plan benefits as provided in Section 4(a) and 4(b) respectively, in Article I of the Program shall not be exercised except by mutual agreement between the Company and the Union.
>
> (b) The option afforded the Company to provide a plan of benefits supplementary to the Federal Benefits or to substitute a plan of benefits for the benefits provided by the Federal Laws as provided in Sections 5(a) and 5(b) respectively, in Article I of the Program shall not be exercised except by mutual agreement between the Company and the Union.

14

> (c) The options afforded the Company to select plans as provided in Article III of the Program shall be exercised only by mutual agreement between the Company and the Union.
>
> **Section 4.  Administration**
>
> (a) The Company shall have the responsibility for Administration of the Program.
>
> (b) Any provisions which may be established pursuant to Article III, Section 7 of the Program shall be implemented by mutual agreement between the Company and the Union.

(*Id.* at Pg ID 1874).

 ***These restrictions, however, were not permanent***.  Supplement C contained

the following durational clause:

> **Section 11.   Duration Of Agreement**
>
> This Agreement [*i.e.*, Supplement C] and Program [*i.e.*, Supplement C-1] shall continue in effect until the termination of the Collective Bargaining Agreement of which this is a part.

(*Id.* at Pg ID 1876).

 **C.** **Jackson Plant Closing And Termination Of The CBA.**

 On September 30, 2005, Kelsey-Hayes entered into a Plant Shutdown

Agreement with the Union in its capacity as the bargaining representative.  (Doc. 37-8,

Plant Shutdown Agreement).  TRW Automotive also signed the closing agreement as

the parent of Kelsey-Hayes.   (*Id.*).  The closing agreement specified that the Jackson

CBA would terminate with the cessation of production at the facility:

> Except as modified by this Plant Shutdown Agreement, the Collective Bargaining Agreement between the parties dated February 10, 2003, is extended and shall remain in effect until production ceases at the facility.

(Doc. 37-9, Pg ID 1932, Plant Shutdown Agreement).

### D.    Post-Closing Changes In Retiree Health Insurance.

Since the Jackson plant closed and the collective bargaining agreement expired,

Kelsey-Hayes has made a number of changes to retiree health insurance coverage.

(Doc. 36-2, ¶ 8, Pg ID 908, Declaration of Shelly Iacobelli).  For 2007, Kelsey-Hayes

changed the insurance carrier from Blue Cross Blue Shield of Michigan to Meritain.

(*Id.*).  In 2009, Kelsey-Hayes changed the insurance carrier again, switching from

Meritain to Humana, Inc.  (*Id.*).  These changes were accompanied by changes in

coverage, in networks and/or in the insurance process.  (Doc. 37-11, Pg ID 1974,

Deposition of Danny O. Stevens (acknowledging change to Blue Cross Shield in

2008)).

For example, when Humana became the carrier in 2009, the insurance program

was altered to require all eligible retirees to enroll in Medicare Parts A and B if they

had not already done so, requiring the retirees to pay monthly Part B premiums.

(Doc. 36-2, ¶ 9, Pg ID 908, Declaration of Shelly Iacobelli).  This process also

required all participating retirees to re-enroll in the health plan if they wished to

continue their coverage, which was a fairly lengthy and complex process. (*Id.*). In addition, some retirees had to select a new doctor or doctors if they wished to take advantage of the most generous coverage as their prior doctor may not have participated in Humana's network. (*Id.*).

By 2011, retirees were offered three separate programs, some insured and some self-insured, providing different levels of benefits. (Doc. 37-16, Pg ID 2022, 2011 Open Enrollment Form). The company was paying an average of $6,300 for each Medicare-eligible spouse or retiree for their supplemental Medicare coverage. (Doc. 37-2, ¶ 20, Pg ID 1439, Declaration of Shelly Iacobelli).

### E.    Medicare Changes.

During this same timeframe, Congress was enacting a series of statutes to protect purchasers of so-called "Medigap" plans, *i.e.*, insurance plans to cover varying portions of expenses excluded by Medicare Parts A and B. These protections included restrictions on preexisting condition exclusions, the sale of duplicative coverage, and various other issues. *See* 42 U.S.C. §§ 1395c-1395i5; 1395j-1395w5.

Congress also adopted a standardized set of Medigap plans to be offered by private insurers, which were each identified by a letter (*i.e.*, Supplemental Plan A, Supplemental Plan B, *etc.*) *See* 42 U.S.C. § 1395s5; 42 C.F.R. part 403. The most popular of the standardized plans is Supplemental Plan F, which covers virtually all co-payments and deductibles for Medicare. (Doc. 37-2, ¶ 21, Pg ID 1440, Declaration

of Shelly Iacobelli). Thus, an individual who is covered by Medicare Parts A and B, along with a Plan F Medigap policy will have virtually no out-of-pocket costs. (*Id.*).

On January 1, 2006, Medicare Part D added prescription drug coverage for Medicare recipients, shifting catastrophic prescription costs largely to the federal government. *See* 42 U.S.C. § 1395w-101. Because Medicare Parts A and B already covered hospitalization and outpatient services respectively, the introduction of Part D prescription drug coverage made retiree health care costs significantly more manageable. (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli). As a result, Medigap plans became more cost-effective. (*Id.*). Further, as commercial insurance carriers entered the market, the supplemental plans began offering nationwide pools that cost, per retiree, as little as half or even less than half of what Kelsey-Hayes was paying in the past for the Jackson retirees. Tax-free HRAs also became available to pay the cost of such coverage. (*Id.*).

## F.    Kelsey-Hayes' Implementation Of The HRA Program.

### 1.    The HRA Structure.

As a result of these changes, Kelsey-Hayes was able to provide Medicare-eligible retirees (including those from the Jackson plant) with better, more flexible coverage at a significant cost savings. (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli). To that end, in September 2011, Kelsey-Hayes announced that it was establishing Health Reimbursement Accounts, or "HRAs," for retirees over the age of 65 and their eligible dependents. (*Id.*). Kelsey-Hayes funded each participant's

account with an initial contribution of $15,000 in 2012, and an additional contribution of $4,800 in 2013. (*Id.*). Thus, a household with a retiree and a spouse enrolled in the program collectively received $39,600 in tax-free health care contributions in 2012 and 2013, an amount far in excess of projected coverage costs. (*Id.*).

Using these Company-provided HRA funds, retirees were able to purchase individual health insurance policies from selected carriers. The available plans included Medigap coverage, Medicare Part D prescription coverage, and Medicare Advantage plans (which essentially bundle Medicare Parts A, B and, in most cases, D coverage together with Medigap coverage into a single, private insurance plan). (Doc. 37-2, ¶ 11, Pg ID 1436, Declaration of Shelly Iacobelli). These plans were offered by some of the largest health insurance carriers in the United States, including AARP, Blue Cross, Delta Dental, Unicare, Aetna Medicare, Humana, Anthem, Cigna, and UnitedHealthcare. (Doc. 37-2, ¶ 12, Pg ID 1438 Declaration of Shelly Iacobelli). Overall, the retirees were able to select the best coverage for their needs from literally dozens of options. (*Id.* at ¶ 11, Pg ID 1438).

## 2.    The HRA Enrollment Process.

To help Jackson retirees identify the best plan for their needs, Kelsey-Hayes retained Extend Health, a company that specializes in assisting Medicare-eligible individuals with the selection of supplemental insurance. (Doc. 36-2, ¶ 11, Pg ID 909, Declaration of Shelly Iacobelli). Each retiree had the opportunity for a one-on-one discussion with an Extend Health representative. (Doc. 37-2, ¶ 11, Pg ID 1436,

Declaration of Shelly Iacobelli). Prior to the discussion, the retiree was asked to complete a single-sheet enrollment questionnaire that requested little more than a list of the doctors the retiree was seeing (to identify the right provider network), and a list of prescriptions the retiree was taking (to identify the right drug plan). (Doc. 37-16, Enrollment Form). Notably, this form was far simpler than Medicare's own approved claim form. (Doc. 37-17, Medicare Claim Form).

Retirees remained free, however, to select any plan they wished from those that were offered. (Doc. 37-2, ¶ 12, Pg ID 1437, Declaration of Shelly Iacobelli). For example, retirees who wished to replicate (or even exceed) their prior coverage were able to select a Supplemental Plan F and PDP at a cost of approximately $215 per month, inclusive of all office visits, hospital stays, and deductibles (with a small reimbursable prescription drug cost with no deductible). (*Id*). Alternatively, retirees who wished to pay lower premiums had the ability to select from plans with small deductibles and/or co-pays (which were also reimbursable from HRA funds). (*Id*).[2]

In addition to payment of insurance premiums, retirees were able to use HRA funds for *any* eligible medical expenses. (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli). This included reimbursement for premium medical equipment, Medicare Part B premiums, out-of-network medical care, non-covered procedures and/or prescription drugs, and a number of other expenses that retirees previously

---

[2] As explained below, some of these costs were not covered under the CBA.

paid from their own pockets.  (*Id.*).  Any HRA funds that remained unused rolled over into the next year.  (Doc. 39-19, Pg ID 2675, 2012 New Coverage New Choices Booklet.).

### 3.    The HRA Reimbursement Process.

After selecting an insurance plan, retirees paid premiums directly to the insurance carrier.  They also paid for any medical costs that were not covered by the insurance plan they selected.  The retirees then submitted proof of such payments to Extend Health, and Extend Health reimbursed them from their HRA accounts.  (Doc. 37-11, Pg ID 1979, Reimbursement Form).  While this process was painless to begin with, it was further simplified by the fact that the vast majority of insurance policies allowed for automated premium payment and reimbursement.  (Doc. 37-11, Pg ID 1977, Deposition of Danny O. Stevens).

The funds that Kelsey-Hayes provided in the HRAs for Jackson retirees were more than sufficient to cover the retirees' expenses.  Through all of 2012, the first full year of the HRA program, no Jackson retiree exhausted his or her funds.  (Doc. 37-2, ¶ 14, Pg ID 1437, Declaration of Shelly Iacobelli).  In fact, single Jackson retirees had an average of $13,133.63 in remaining HRA funds.  (*Id.*).  Married Jackson retirees had an average of $25,146.11.  (*Id.*).

Yet, even at this abundant funding level, the new HRA structure was significantly more cost-effective than the prior group insurance plan.  Under the old plan, the average per-beneficiary cost for retirees was $6,800.  (Doc. 37-2, ¶ 20, Pg ID

1439, Declaration of Shelly Iacobelli). While a precise per-beneficiary cost was not calculated under the HRA structure, Kelsey-Hayes estimated an average cost of approximately $3,000 per retiree in health care expenses and a $198 administrative cost, for a total of $3,198. (*Id.*).

### G.   The District Court Proceedings.

#### 1.   Kelsey-Hayes' Motion To Compel Arbitration.

As noted above, plaintiffs filed a Complaint against defendants alleging that the HRA implementation violated the Jackson CBA and plant closing agreement. (Doc. 1, Complaint). Defendants immediately filed a motion to compel arbitration on the basis that these claims were subject to the closing agreement's arbitration provision. (Doc. 13, Motion to Compel Arbitration By All Defendants). Plaintiffs opposed this motion on the grounds that the Union had no authority to bargain on behalf of the retirees: "[R]etirees are not employees and, as a matter of law, unions have *no duty* to represent retirees, and *no authority* to do so absent their consent." (Doc. 15, Pg ID 163, Plaintiffs' Opposition to Motion to Compel Arbitration). In denying defendants' motion, the District Court agreed with plaintiffs and held that the plant closing agreement could not bind individuals who retired prior to its execution. (Doc. 20, Pg ID 447, Order Denying Motion to Compel Arbitration).

#### 2.   Plaintiffs' Evidence.

During discovery, Kelsey-Hayes deposed plaintiffs Strait and Stevens in their individual capacities. (Doc. 37-10, 37-11, Deposition Excerpts from Ronald Strait and

Danny O. Stevens). In addition, the Union designated Strait as its representative for deposition under Fed. R. Civ. Pro. 30(b)(6).

When confronted with the Supplement C-1 provision that expressly provided Kelsey-Hayes with the right, "in its judgment," to "substitute" a different insurance "arrangement," the Union testified through Strait that it had no idea how this language should be interpreted. (Doc. 37-10, Pg ID 1938, Deposition of Ronald Strait). Plaintiff Stevens confirmed that this language had been included in the Jackson CBA since at least 1995, but was similarly unable to explain its meaning. (Doc. 37-11, Pg ID 1972-73, Deposition of Danny O. Stevens). Stevens simply speculated that it may have been included due to a "typographical error." (*Id.*).

### 3.     The Parties' Cross-Motions for Summary Judgment.

Both parties moved for summary judgment. (Doc. 37, Defendants' Motion for Summary Judgment; Doc. 47, Plaintiffs' Motion for Summary Judgment). Defendants argued that the two TRW entities were not proper defendants because they were not parties to the Jackson CBA and had not employed any of the class members. In regard to Kelsey-Hayes, defendants explained that the new HRA structure was consistent with the language of the Jackson CBA. In addition, under the Sixth Circuit's holding in *Reese II*, defendants argued that the HRA implementation was a reasonable change and therefore was proper. *See Reese v. CNH Am. LLC*, 694 F.3d 681, 685-86 (6th Cir. 2012) ("*Reese II*"). Defendants specifically noted plaintiffs'

failure to identify *any* class member (including the two individual named plaintiffs) who had experienced any out-of-pocket expense as a result of the HRA adoption.

In support of their competing motion for summary judgment, plaintiffs argued that prior retiree litigation (discussed below) collaterally estopped defendants from making insurance changes. (Doc. 47, Pg ID 3071, Plaintiffs' Motion for Summary Judgment). In addition, they claimed that *Reese II* did not apply, as the CBA included a "mutual agreement" provision that required Kelsey-Hayes to negotiate with the Union concerning changes to retire healthcare. (Doc. 54, Pg ID 3920, Plaintiffs' Response to Defendants' Motion for Summary Judgment). This argument contradicted plaintiffs' earlier insistence that the Union was barred from negotiating on behalf of retirees, a fact that defendants pointed out in their reply memorandum. (Doc. 15, Pg ID 163, Plaintiffs' Opposition to Motion to Compel Arbitration; Doc. 56, Pg ID 4444, Reply In Support of Defendants' Motion for Summary Judgment).

### 4.  <u>The District Court's Summary Judgment Award</u>.

The District Court granted summary judgment in favor of plaintiffs and denied Kelsey-Hayes' motion. (Doc. 65, Opinion and Order). In its Order, the District Court found that the *Reese II* analysis was unnecessary on essentially three grounds. First, the court held that all relevant issues had been decided against Kelsey-Hayes in *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173 (E.D. Mich. 1997), a prior case from a *different* Kelsey-Hayes plant involving *different* retirees who worked under a *different* CBA. On this basis, the court ruled that collateral estoppel barred implementation of

the HRA structure.  (Doc. 65, Pg ID 4997-5000, Opinion and Order).

Second, the District Court found that *Reese II* was not applicable based on its conclusion that class members had a vested right to Company-paid health insurance under the Jackson CBA and the incorporated supplements. The court based this finding on contractual language stating that Kelsey-Hayes would pay the "full premium or subscription charge for [retiree] health care coverages."  (Doc. 65, Pg ID 4995-4997, Opinion and Order).  Despite unchallenged evidence that HRA funds Kelsey-Hayes provided were more than sufficient to reimburse all insurance premiums, the court held that the HRA structure was inconsistent with this obligation. (*Id.*).

Third, the District Court held that the *Reese II* analysis was inapplicable because the Jackson CBAs only permitted changes "with the agreement of the Union." (Doc. 65, Pg ID 5003, Opinion and Order).  The court did not address the contrary position that plaintiffs asserted in successfully challenging defendants' motion to compel arbitration.  The court similarly ignored plaintiffs' inability to explain undisputed contract language specifically authorizing Kelsey-Hayes, "in its judgment," to substitute other insurance "arrangements."

In addition to rejecting the application of *Reese II*, the District Court held that the TRW defendants were proper parties.  The court based this holding entirely upon four facts: (i) that Kelsey-Hayes was identified in the Jackson plant closing agreement as "Kelsey-Hayes Company, a subsidiary of TRW Automotive," (ii) that the TRW

25

entities were mentioned in financial reports discussing Kelsey-Hayes' retiree healthcare expenses, (iii) that the announcement of the HRA structure was sent to retirees on letterhead with the "TRW Automotive" brand name, and (iv) that the individuals who oversaw the HRA implementation were allegedly employed by TRW. (Doc. 65, Pg ID 5000-5001, Opinion and Order). On this basis, the District Court held that the TRW defendants "[were] liable for the CBA breaches" and granted summary judgment against them. (*Id.*).

The court therefore ordered defendants to "restore the status quo by reinstating the Plaintiffs' healthcare coverage in effect until 2012," and permanently enjoined them from making any further unilateral changes to the retiree healthcare coverage. (Doc. 65, Opinion and Order).

### 5. The District Court's Order Granting Plaintiffs' Post-Judgment Motion For A Preliminary Injunction.

On May 3, 2013, plaintiffs filed a motion for permanent injunction to "provide detail" to the District Court's summary judgment ruling. (Doc. 69, Motion for Permanent Injunction). Plaintiffs requested that defendants be required to: (A) "comply with its CBA obligations regarding retirement healthcare;" (B) restore the "status quo ante;" (C) "continue to provide [the promised] healthcare benefits, at no premium cost to class members, for the lifetime of each class member;" and (D) "identify" and "make whole" the class members for the expenses they incurred due to the healthcare changes. (*Id.* at Pg ID 5021). Plaintiffs also asked the District Court to

retain jurisdiction over post judgment matters. (*Id.*)

Defendants opposed plaintiffs' motion on several grounds, including the fact that that their request for "healthcare benefits at no premium cost" was contradicted by both the District Court's previous order and the express language of the CBA. Defendants also pointed out that they had no obligation to "identify" class members. (Doc. 75, Opposition to Motion for Permanent Injunction).

The District Court subsequently denied the requested permanent injunction to the extent it required defendants to identify class members, but otherwise granted it in full. (Doc. 82, Order Granting Plaintiffs' Motion For Permanent Injunction In Part and Denying In Part).

### 6.    The District Court's Order Granting Attorneys' Fees.

Following the award of summary judgment, class counsel moved for an award of attorneys' fees in the amount of $595,500. (Doc. 70, Motion for Attorney Fees). Defendants opposed the motion on the grounds that the hours claimed by class counsel were excessive, and their time entries were improperly vague and bundled. Defendants also noted that the amount requested by class counsel included items that were not properly chargeable, such as time spent transcribing audio tapes and inquiring with court reporters concerning invoices. (Doc. 76, Response to Motion for Attorney Fees).

The District Court agreed that class counsel's hours were "excessive," but decided without explanation to reduce the attorney hours by only 10%. (Doc. 82,

Order Granting In Part Plaintiffs' Motion for Attorney Fees).  The District Court did

not address or acknowledge the various other deficiencies that defendants identified.

As a result, the court awarded $520,516.50 in fees and $4,248.96 in costs in a case with

only six depositions that never went to trial.  (*Id.*).

## VI.    **SUMMARY OF ARGUMENTS**

The District Court erred in this case by granting summary judgment to plaintiffs based on its refusal to apply the *Reese II* reasonableness analysis. The court based its refusal on (i) the alleged collateral estoppel effect of prior Kelsey-Hayes retiree litigation, (ii) a finding that the Jackson retirees had a vested right to insurance benefits, and (iii) the mutual agreement provisions of the Jackson CBA. The prior case that the District Court relied upon in applying collateral estoppel principles, however, involved different issues under different CBAs that covered different retirees who worked at different plants. The District Court's finding that the Jackson retirees had a vested right to insurance benefits is similarly unavailing. In fact, application of the *Reese II* test *assumes* the existence of vested benefits. Finally, the rationale of the *Reese II* decision confirms that its reasonableness test applies to insurance modifications regardless of whether the underlying contract contains a mutual agreement provision.

The District Court further erred in denying defendants' motion for summary judgment. There is no dispute that the HRA structure satisfies the *Reese II* analysis as a "reasonable" modification. Defendants introduced substantial evidence demonstrating that each factor of the *Reese II* inquiry is satisfied. Plaintiffs presented *no* evidence or argument to the contrary.

The District Court compounded these errors by granting plaintiffs' post-judgment motion for an overbroad permanent injunction. In particular, the District

Court went beyond the change to the HRA structure and prohibited Kelsey-Hayes from making any changes in retiree insurance ever in the future.  Thus, not only did the District Court err in refusing to apply *Reese II* to the facts of this case, it furthermore erred in holding that *Reese II* can never apply to the Jackson retirees going forward.

Finally, the District Court abused its discretion when it arbitrarily reduced class counsel's requested fees by only 10%.  This modest reduction stands in contradiction to the overwhelming evidence cited both by defendants and even by the District Court that class counsel's fees were improper.  While defendants respectfully submit that this Court should award judgment as a matter of law in their favor (obviating the basis for a fee award), defendants request that the fee issue should be decided by this Court in the event that the Court does not overturn the judgment in plaintiffs' favor.

## VII.  APPLICABLE STANDARDS OF REVIEW

### A.    The District Court's Summary Judgment Award.

A district court's decision to grant a motion for summary judgment is reviewed *de novo* by the appellate court. *Logan v. Denny's Inc.,* 259 F.3d 558, 566 (6th Cir. 2001). Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c).  A district court must construe all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Klepper v. First Am. Bank,* 916 F.2d 337, 341-42 (6th Cir. 1990) *(citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

### B.    The District Court's Award Of Attorneys' Fees.

This Court reviews a decision to award attorneys' fees in an ERISA action for an abuse of discretion.  *Gaeth v. Hartford Life Ins. Co.,* 538 F.3d 524, 529 (6th Cir. 2008).  An abuse of discretion exists where "the District Court made a clear error of judgment in its conclusion upon weighing relevant factors."  *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 376 (6th Cir. 2009) (citations omitted).

## VIII. <u>THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR</u>.

Plaintiffs' claims are premised upon Section 301 of the Taft-Hartley Act, 29 U.S.C. § 185 ("Section 301"), and must therefore be based on the terms of the relevant contract. *See Voyk v. Brotherhood of Locomotive Eng'rs*, 198 F.3d 599, 602 (6th Cir. 2000) citing *Sprague v. General Motors*, 133 F.3d 388, 400 (6th Cir.), *cert. denied*, 524 U.S. 923 (1998) ("the intent to vest [welfare benefits] must be found in the plan documents and must be stated in clear and express language" (citations omitted)). When discerning the parties' intent in a CBA, a court must first look to the explicit contract language. *UAW v. Yardman Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983). The court must interpret the contract in a manner that gives effect to all of its provisions. *See Paper, Allied Industrial, Chemical & Energy Workers Intern. Union v. Air Prod. Chemicals, Inc.*, 300 F.3d 667, 676 (6th Cir. 2002) (holding that all provisions in a contract must be given meaning to determine its effect).

In Section 301 cases involving retiree health insurance, this Court typically applies a rebuttable inference that such benefits are "vested," *i.e.*, that they are intended to continue for the life of retirees (the "*Yard-Man* inference"). *See UAW v. Yardman Inc.*, 716 F.2d 1476 (6th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984). This Court recently adopted a critical caveat to the *Yard-Man* inference, however, in *Reese v. CNH Am. LLC*, 694 F.3d 681 (6th Cir. 2012) ("*Reese II*"). The Court held in *Reese II* that a vested right to lifetime retiree health insurance does not preclude the employer

from making changes to that insurance, so long as the changes are "reasonable." *Id.* at 685. The Court provided a number of factors for district courts to consider in making this determination. *Id.* at 685-86.

The District Court in this case refused to perform a *Reese II* analysis in granting summary judgment in plaintiffs' favor and denying defendants' summary judgment motion. As explained below, this refusal was erroneous.

### A.    The District Court Erred In Finding That The TRW Defendants Were Proper Parties.

As noted above, it is undisputed that TRW Automotive Holdings Corp. and TRW Automotive Inc. were *not* parties to the CBA at issue in this case. (Doc. 37-3, 2003 CBA; 37-4, 1999 CBA; 37-6, 1995 CBA). Indeed, neither TRW Automotive Holdings Corp. nor TRW Automotive Inc. existed at the time Stevens or Strait retired. (Doc. 37-2, ¶¶ 18-19, Pg ID 1439, Declaration of Shelly Iacobelli). Nonetheless, the District Court included the TRW defendants in its award of summary judgment solely because (i) Kelsey-Hayes was identified in the Jackson plant closing agreement as "Kelsey-Hayes Company, a subsidiary of TRW Automotive," (ii) the TRW entities were mentioned in financial reports discussing Kelsey-Hayes' retiree healthcare expenses, (iii) the announcement of the HRA structure was sent to retirees on TRW Automotive letterhead, and (iv) the individuals who oversaw the HRA implementation were employed by an unspecified TRW entity. (Doc. 65, Pg ID 5000-5001, Opinion and Order).

These facts, however, are irrelevant. At most, they establish that the TRW defendants were involved in implementing the HRA structure. They do not in any way suggest (much less establish *as a matter of law*) that the TRW defendants assumed liability for Kelsey-Hayes' contractual obligations. Summary judgment against the TRW defendants therefore was improper on this basis alone, in addition to the other flaws addressed below.

**B.    The District Court Erred In Finding That Collateral Estoppel Barred Defendants From Implementing The HRA Structure Under The Jackson CBA.**

The District Court held that class members were entitled to summary judgment on the basis that collateral estoppel precluded Kelsey-Hayes from arguing that their health benefits were not vested for life. The court based this holding on *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1178-79, 1186 (E.D. Mich. 1997), a prior case involving retirees who worked at Kelsey-Hayes' Detroit plant, a different plant, under a different collective bargaining agreement. This holding was erroneous.[3]

Collateral estoppel applies only where there has been an affirmative showing of five required factors:

---

[3]    The District Court also relied on an award by Arbitrator Paul E. Glendon in which Glendon concluded that certain Kelsey-Hayes retirees had a right to vested benefits. (Doc. 65, Pg ID 4996, Opinion and Order). These retirees, however, were also from the Detroit plant and were covered under the CBA at issue in *Golden*. Thus, the Glendon Award is not a sufficient basis upon which to apply collateral estoppel for the same reasons that *Golden* fails in this regard.

(i)    The issue in the subsequent litigation is identical to that resolved in the earlier litigation;

(ii)   The issue was actually litigated and decided in the prior action;

(iii)  The resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation;

(iv)   The party to be estopped was a party to the prior litigation (or in privity with such a party); and

(v)    The party to be estopped had a full and fair opportunity to litigate the issue.

*See Hammer v. INS*, 195 F.3d 836, 840 (6th Cir. 1999).  The District Court found that these factors were established in this case based on its conclusion that the Jackson and Detroit CBAs contained similar benefits language.  Because the Detroit CBA was interpreted in *Golden* to create vested retiree health benefits, the District Court held that the Jackson agreement must be interpreted in the same fashion.  As a result, the court held, collateral estoppel barred defendants from arguing that the change to the HRA structure was permissible. (Doc. 65, Pg ID 4996, Opinion and Order).

The *Golden* case arose after Kelsey-Hayes announced that it would begin charging deductibles and co-insurance to retirees of up to $4,600 annually, and would additionally require retirees to contribute toward their monthly health insurance premiums. 954 F. Supp. at 1175.  The plaintiffs claimed that they had a vested right to fully paid health insurance, and that the planned changes therefore violated the Detroit CBA.  The court granted summary judgment in plaintiffs' favor on the basis that the Detroit CBA required the Company to "contribute the full premium or

35

subscription charge" for retiree insurance. *Id.* at 1178. Because the Jackson CBA contained some similar language, the District Court held in this case that *Golden*'s collateral estoppel effect precluded implementation of the HRA structure.

The mere fact that the Detroit and Jackson CBAs both contained this similar provision, however, is insufficient to support the application of collateral estoppel. Collateral estoppel can only apply where the *precise* issue raised in the subsequent case was "*actually litigated and decided* in the prior action." *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 367 (6th Cir. 2009). As noted above, a collective bargaining agreement must be interpreted in a manner that gives effect to all of its provisions. *See Air Prod. Chemicals, Inc.*, 300 F.3d at 676. While the Detroit and Jackson CBAs contained similar "full premium" provisions, the issue in this case is the degree to which Article III, Section 5, Subsection (h) of the Jackson agreement acts as a qualifier in regard to this language. The *Golden* court never addressed any such provision in the Detroit CBA.

Even more critical, however, is the fact that *Golden* concerned an issue entirely separate from the question presented in this case. In particular, *Golden* addressed whether the Detroit retirees had a vested right to Company-paid health insurance. The *Golden* retirees, as a result of the changes in their benefits, were required to pay premiums, deductibles and co-insurance from their own pockets. *Golden*, 845 F.Supp. at 412. The court held that this change was inconsistent with the "full premium" provision in the Detroit CBA.

36

Here, in contrast, it is undisputed that Kelsey-Hayes provided all class members with sufficient HRA reimbursement funds to purchase insurance that was the equal or better of their prior coverage, and to pay medical costs well beyond those covered under the prior group plan. Thus, the question is not whether plaintiffs were entitled to Company-paid insurance. Rather, plaintiffs in this case are complaining about the *manner* in which the Company provided this fully paid benefit.

This issue was never raised or addressed in the *Golden* case. The District Court therefore erred in relying on collateral estoppel principles in granting summary judgment in plaintiffs' favor. At a minimum, defendants have raised a genuine issue of fact in this regard.

### C.    The District Court's Finding On Vested Benefits Was Not A Proper Basis For Declining To Apply *Reese II*.

The District Court also erred in holding that vesting principles under *Yard-Man* and its progeny rendered the *Reese II* analysis unnecessary in this case. *Yardman*, 716 F.2d at 1479. The court found that the Jackson retirees were entitled to vested insurance benefits based on the language of the Jackson CBA and on an "estoppel by conduct" theory (*i.e.*, that Kelsey-Hayes' payment of retiree benefits in the past somehow obligated the Company to continue paying them in perpetuity). The District Court then concluded that, because these benefits were vested, Kelsey-Hayes was precluded from modifying them. This finding is contrary to this Court's holding in *Reese II*.

After the employer in *Reese* announced that it was implementing changes in retiree healthcare, the plaintiff retirees sought declaratory judgment that they were entitled to lifetime, company-paid health insurance. *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009) ("*Reese I*"). The district court initially granted summary judgment in the plaintiffs' favor. On the employer's initial appeal, this Court agreed that the plaintiffs had a vested right to health insurance, but held that this right did not preclude the employer from making reasonable changes to the benefits provided. *Id.* at 327. The Court remanded the case with instructions for the district court "to decide how and in what circumstances [the employer] may alter such benefits—and to decide whether it is a matter amendable to judgment as a matter of law or not." *Id.*

Following remand, the district court again granted judgment in plaintiffs' favor. On the second appeal, this Court once again reversed the district court's ruling and stated that, as a matter of law, an employer *can* make "reasonable" changes to retiree health insurance even where retirees have a vested right to that benefit. *See Reese II*, 694 at 685-86. As explained below, the Court enumerated a series of factors to be considered in the reasonableness inquiry. *Id.*

Here, based on its finding that class members had a vested right to Company-paid health insurance, the District Court concluded that Kelsey-Hayes had no right to modify this insurance. As this Court recognized in *Reese II*, however, a finding that retirees have a vested right to insurance benefits does not equate to a finding that the employer is precluded from making reasonable changes to those benefits. Thus, the

District Court's refusal to conduct the *Reese II* reasonableness analysis was erroneous. Its decision granting summary judgment in plaintiffs' favor must be overturned.

**D.    The District Court's Restrictive Reading Of *Reese II* Does Not Support Summary Judgment In Plaintiffs' Favor.**

In rejecting the *Reese II* reasonableness analysis, the District Court also relied upon language in Supplement C that, in the court's view, required Kelsey-Hayes to bargain with the Union over changes in retiree health insurance.  The court held that *Reese II* cannot apply in cases involving such "mutual agreement" provisions. (Doc. 65, Pg ID 5003, Order Granting Summary Judgment for Plaintiffs).  This holding is erroneous for several reasons.

**1.    Kelsey-Hayes' Alleged Duty To Bargain Does Not Preclude *Reese II*'s Application.**

First, the District Court's restrictive reading of *Reese II* is inconsistent with the broad policy considerations underlying that decision. The *Reese II* court, in fact, expressly relied on such considerations in finding that vesting in the health and welfare context provides an evolving, not a fixed, benefit:

> In answering the second question ("What does vesting mean in this setting?"), we rejected the suggestion that the scope of this commitment in the context of healthcare benefits, as opposed to pension benefits, meant that [the employer] could make no changes to the healthcare benefits provided to retirees. Unlike pension obligations, we explained, healthcare benefits cannot readily be monetized at retirement or for that matter practically fixed. Doctors and medical-insurance providers come and go. Medical plans change from year to year. And fixed,

> unalterable medical benefits at all events are not what
> retirees want.

*Reese II*, 694 F.3d at 683.  Nothing in the *Reese II* opinion suggests that these policy

considerations, which favor both employers and retirees, should be ignored or even

discounted based on the language of a particular collective bargaining agreement.

### 2.    Judicial Estoppel Principles Undermine The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes.

Second, the District Court overlooked plaintiffs' prior insistence that the Union

had *no authority* to bargain on behalf of the Jackson retirees.  In opposing defendants'

motion to compel arbitration, plaintiffs argued that "retirees are not employees and,

as a matter of law, unions have *no duty* to represent retirees, and *no authority* to do so

absent their consent." (Doc. 15, Pg ID 163, Plaintiffs' Opposition to Motion to

Compel Arbitration).  The District Court accepted this argument in denying

defendants' motion to compel, finding that the plant shutdown agreement (which

contained the relevant arbitration provision) could not bind those individuals who

retired after its execution. (Doc. 20, Pg ID 447, Order Denying Motion to Compel

Arbitration).

Having earlier prevailed on this argument, judicial estoppel barred plaintiffs

from asserting a contrary position. *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218

(6th Cir. 1990).  The District Court erred by allowing them to do so.  Further, such a

construction would require Kelsey-Hayes to bargain with an entity that, according to

both the District Court and the Union, had no authority to bargain.  Thus, the District

Court's interpretation renders entire swaths of the contract irrelevant. The futility of such an obligation further demonstrates the flaws in the District Court's decision.

### 3.    The CBA's Expiration Undermines The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes.

Third, the District Court's holding is flawed because it is based on provisions that expired with the Jackson CBA in 2006. Specifically, the District Court found that Supplement C required Kelsey-Hayes to negotiate with the Union prior to changing retiree healthcare under Supplement C-1. But, this precondition was contained only in Supplement C and expressly limited to Supplement C's duration:

> **Section 11.   Duration Of Agreement**
>
> This Agreement [*i.e.*, Supplement C] and Program [*i.e.*, Supplement C-1] ***as modified and supplemented by this Agreement*** shall continue in effect until the termination of the Collective Bargaining Agreement of which this is a part.

(Doc. 37-8, Pg ID 1876, Supplement C). Thus, once Supplement C expired, the limitations contained therein ceased to apply. From that point forward, the retirees' right to health insurance was governed *solely* by Supplement C-1, rather than by Supplement C-1 "as modified and supplemented by" Supplement C.

There is no other reading that would harmonize the meaning of the two Jackson supplements or to give effect to several otherwise extraneous provisions. Thus, because a collective bargaining agreement must be interpreted in a manner that gives meaning to all of its provisions, the District Court's reading of the Jackson CBA and the incorporated supplements was erroneous. *See Paper, Allied Industrial, Chemical*

*& Energy Workers Intern. Union v. Air Prod. Chemicals, Inc.*, 300 F.3d 667, 676 (6th Cir. 2002). At a minimum, the District Court's reading is inconsistent with its obligation to construe all reasonable inferences in defendants' favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Klepper v. First Am. Bank,* 916 F.2d 337, 341-42 (6th Cir. 1990) *(citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

### 4.    Plaintiffs' Deposition Testimony Undermines The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes.

The District Court further held that the Supplement C-1 provisions authorizing Kelsey-Hayes to implement health insurance modifications applied only to active employees. (Doc. 65, Pg ID 5003, Order Granting Summary Judgment). In its Rule 30(b)(6) deposition, however, the Union testified through its designated witness that it had no idea how Supplement C-1's language should be interpreted. (Doc. 37-10, Pg ID 1938, Deposition of Ronald Strait). Tacitly acknowledging the fact that this language substantially undermines plaintiffs' claims, plaintiff Stevens speculated that its inclusion must have been the result of a "typographical error." (Doc. 37-11, Pg ID 1972-73, Deposition of Danny O. Stevens).

Despite this testimony, the District Court supplied its own reading of Supplement C and Supplement C-1. Given the fact that the court was addressing this issue in the summary judgment context, however, this reading was not a proper basis for the District Court's decision. To the contrary, regardless of the District Court's preferred reading of Supplements C and C-1, Plaintiffs' testimony remains sufficient

to establish a genuine issue of material fact.  Summary judgment in favor of plaintiffs' class therefore was improper.

> ### 5.    The Parties' History Of Unilateral Changes Undermines The Existence Of Any Duty To Bargain Over Retiree Healthcare Changes.

The fact that Kelsey-Hayes made prior unilateral changes to the retiree healthcare structure without the Union's agreement further confirms that the Jackson CBA did not require the Company to bargain in such circumstances.  The District Court abruptly disregarded this evidence as having been "soundly rejected by previous decisions of [the district court]."  This Court, however, has not been so dismissive.  In fact, the Court relied on evidence of precisely this kind in approving of the changes at issue in *Reese II*:

> Also confirming that the parties did not perceive the relevant CBAs as establishing fixed, unalterable benefits was [that] . . . [n]o one batted an eye when the healthcare plans for which retirees were eligible were modified to account for the creation of Medicare Part D.

*Reese II*, 694 F.3d at 684.

\*   \*   \*   \*

For the reasons explained above, the District Court erred in disregarding this Court's *Reese II* decision and in granting summary judgment in plaintiffs' favor.  Its decision therefore should be overturned.

## IX. THE DISTRICT COURT ERRED IN DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.[4]

The District Court furthermore erred in denying defendants' cross-motion for summary judgment. For the reasons explained above, the District Court should have applied the *Reese II* reasonableness test to determine whether the HRA implementation was a permissible change in the Jackson retirees' insurance benefits. In establishing the *Reese II* test, this Court provided a litany of factors to be considered:

- What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan? What is the equivalent figure for the new plan?

- What is the average per-beneficiary cost to the employer under the old plan? What is the equivalent figure for the new plan?

- What premiums, deductibles and copayments must retirees pay under the old plan? What about under the new plan?

- How fast are the retirees' out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are the employer's per-beneficiary costs likely to grow under each?

- What difference (if any) is there between the quality of care available under the old and new plans?

- What difference (if any) is there between the new plan and the plans the employer makes available to current employees and people retiring today?

---

[4]  The grounds discussed in this section that support defendants' entitlement to summary judgment provide equal support for the conclusion that the District Court erred in granting plaintiffs' summary judgment motion. These arguments are addressed only once, however, to avoid redundancy.

- How does the new plan compare to plans available to retirees and workers at companies similar to Kelsey-Hayes and with demographically similar employees?

*Reese II*, 694 F.3d at 685-86.

Defendants provided abundant undisputed evidence establishing that each of these factors favored implementation of the HRA structure. (Doc. 37, Pg ID 1425-29, Defendants' Motion for Summary Judgment). In regard to annual, out-of-pocket costs to the retirees, for example, class members actually incurred *less* expense under the HRA structure than they did under the prior plan. All class members were able to pay their Medicare Part B premiums with Company-provided funds, immediately reducing each class member's out-of-pocket medical expenses by at least $1,000 per year (and more for married retirees). (Doc. 36-2, ¶ 13, Declaration of Shelly Iacobelli).

In regard to insurance coverage other than Medicare Parts A and B, all class members had the option to select a Supplemental Plan F and PDP offered at a cost of approximately $215 per month, inclusive of all office visits, hospital stays, and deductibles (with a small reimbursable prescription drug cost with no deductible). The monthly premium for the plan was covered by HRA funds. Retirees who selected plans other than a Supplemental Plan F and PDP were able to use the Company-provided HRA funds to pay for any associated deductibles and copayments, in addition to covering the monthly premiums.

Aside from purchasing insurance, class members were able to use Company HRA funds for lifestyle drugs (*i.e.*, Viagra) and premium medical products (*i.e.*, wheelchairs and hearing aids), to the extent they selected an insurance plan that did not provide coverage for such items. (Doc. 37-2, ¶ 10, Pg ID 1436, Declaration of Shelly Iacobelli). The prior group plan did not offer this coverage and retirees did not have access to Company funds if they wished to purchase them. (*Id.*). In addition, while routine office visits were excluded from the Jackson Supplement C-1 schedule of benefits, class members were able to purchase insurance policies that covered such visits or use HRA funds to cover this expense, a staple of retiree medical care. (*Id.*).

The HRA funds that Kelsey-Hayes provided to retirees were more than sufficient to cover these expenses, as evidenced by the fact that not one retiree exhausted his/her HRA account. (Doc. 37-2, ¶ 14, Pg ID 1437, Declaration of Shelly Iacobelli). In fact, in regard to the anticipated growth rate for retirees' out-of-pocket costs, even assuming an inflated 5% year-over-year increase in the $215 Supplement F and PDP monthly premium, and ignoring all likelihood of any increases in future Company annual HRA contributions, retirees would not have incurred out-of-pocket expenses for decades, if ever.

Despite these improvements, it is undisputed that the HRA structure was estimated to reduce Kelsey-Hayes's 2012 Accumulated Postretirement Benefit Obligation by $17.1 million, and to cut Kelsey-Hayes' per-beneficiary cost by more than 50%. (Doc. 37-2, ¶ 20, Pg ID 1439, Declaration of Shelly Iacobelli). While

plaintiffs alleged without support that this savings reflected a lower quality of benefits, the undisputed evidence confirms that the savings was attributable to the available nationwide insurance pools that were opened up as a result of the HRA structure. The prior group insurance plan was limited to the retirees, and was significantly more expensive.

In response, plaintiffs did not contest the fact that the *Reese II* factors were satisfied, and failed to provide any evidence that would support such a conclusion. The District Court similarly did not address the issue. *In fact, neither plaintiffs nor the District Court offered any discussion at all of the benefits available under the HRA structure.*

Thus, because the unchallenged evidence establishes that the *Reese II* reasonableness test is satisfied, a remand to the District Court is unnecessary. Instead, judgment as a matter of law should be entered in defendants' favor.

## X.    THE DISTRICT COURT ERRED IN GRANTING PLAINTIFFS' POST-JUDGMENT MOTION FOR A PERMANENT INJUNCTION.

The District Court also erred in granting plaintiffs' motion for a permanent injunction requiring defendants to "continue to provide [the promised] healthcare benefits, at no premium cost to class members, for the lifetime of each class member." (Doc. 82, Pg ID 6037, Order Granting Plaintiffs' Motion For Permanent Injunction In Part and Denying In Part). The District Court mistakenly found that this was the level of coverage required by the CBA. (*Id.*). Indeed, the Court stated

that defendants are required to do "nothing more, nothing less" than provide the "same healthcare coverage under the governing CBA." (*Id.* at Pg ID 6037).

However, the CBA does not, as the District Court seemed to conclude, provide plaintiffs with a right to premium-free healthcare without restrictions. Rather, the operative Supplement C-1, Article III § 1, sets forth the precise and exhaustive hospital and medical benefits that are covered. (Doc. 37-8, Pg ID 1897, Supplement C and Supplement C-1). As to hospital benefits, the CBA provided coverage for:

- Semi-private accommodations, providing for up to 365 days (with some limitations for pulmonary and mental conditions), and up to 730 days of care in approved facilities for convalescent and long term illnesses;

- Immediate maternity benefits;

- Unlimited benefits for hemodialysis;

- 60 outpatient visits for physical therapy per condition per year renewable immediately following related surgery;

- Limited psychiatric care in approved outpatient facilities;

- Substance abuse treatment (with limitations);

- Prosthetic appliances;

- Home care benefits;

- Chemotherapy.

(Doc. 37-8, Pg ID 1897, Supplement C and Supplement C-1).

Likewise, Medical Expense Benefits were provided for:

- Surgery;

- Surgical correction of congenital abnormalities;

- Maternity services;

- Sterilization if medically necessary;

- Anesthesia;

- Unlimited medical visits in the hospital (with limitations for pulmonary and mental conditions);

- Limited medical visits at the rate of two visits per week for confinements of up to 730 days (with some limitations);

- Emergency first aid for accidental and medical emergencies;

- Radiation therapy;

- Diagnostic x-rays;

- Laboratory services, in or out of a hospital;

- Unlimited bedside consultations in a hospital or approved facility;

- Physician services related to hemodialysis;

- Substance abuse treatment;

- Prosthetic appliances;

- Chemotherapy;

- Laboratory fee for routine pap smear;

- Ambulance services.

(Doc. 37-8, Pg ID 1897, Supplement C and Supplement C-1). *Notably, expenses such as routine office visits, life-style drugs, premium medical equipment, and Medicare B premium costs are not covered. (See id.).*

While the District Court relied on language in Supplement C-1 that the Company was to "contribute the full premium or subscription charge for health care coverages continued in accordance with Article III, Section 5" (Doc. 82, Pg ID6037) (quoting in part Doc. 37-8, Pg ID1879, Supplement C and C-1), it neglected to

consider the operative language from Article III, Section 5 that retirees were entitled to a continuation of the healthcare coverages they had "under this Article at the time of retirement." (Doc. 37-8, Pg ID1901, Supplement C and C-1). Thus, retirees were *not* entitled to unlimited premium-free healthcare, but rather the healthcare to which they were entitled during their employment as specified in Supplement C-1, Article III § 1. Thus, to the extent the District Court's injunction order requires coverage for any of the expenses not expressly described in Supplement C-1, Article III § 1, it was in error.

Finally, the District Court's injunction order contradicts the CBAs and the District Court's own summary judgment decision by ordering that the benefits be provided "for the lifetime" of each class member. The District Court found that under the applicable CBAs, defendants are permitted to make changes to the retiree healthcare, provided that they reach agreement with the Union. (Doc. 65, Pg ID 5002, Summary Judgment Opinion and Order). As a result, the healthcare benefits are not necessarily "for life," but rather, they are negotiable with the Union. (*See id.*). This is particularly important, given the perpetually fluctuating healthcare costs both now and in the future.

Thus, in the event the District Court's Summary Judgment Order is not reversed, its Permanent Injunction Order should be remanded to reflect that changes in healthcare can be made, pending negotiations and agreement with the Union, and

that defendants are not required to provide hospital and medical benefits "at no premium cost" unless they are expressly identified in Supplement C-1, Article III § 1.

## XI. THE DISTRICT COURT ERRED IN GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES WITHOUT IMPOSING A SIGNIFICANT REDUCTION.

The District Court correctly held that plaintiffs' requested attorneys' fees were excessive. Indeed, the District Court expressly found:

- Class counsel worked nearly 1,200 hours in the proceedings, "which is the equivalent to twenty-nine, forty hour work weeks on this case." (Doc. 83, Pg ID  6050; Doc. 70-11, Pg ID5123-5159, Exhibit J to Plaintiffs' Motion for Attorneys' Fees – Time Entries of Requested Hours and Fees);

- "[T]he amount of time billed for the prosecution of this matter is excessive." (Doc. 83, Pg ID  6050);

- "Counsel spent an excessive amount of time on briefing during these proceedings." (*Id.*);

- "Class counsel spent 119.75 hours preparing a brief [opposing arbitration], even though counsel prepared a brief [opposing arbitration] in another case based on the same legal principles and grounds as those raised in the briefing in the present matter." (*Id.*);

- "Counsel spent 353.35 hours briefing cross motions for summary judgment, even though the governing law presented in their briefing was substantially similar to briefing they submitted in a similar retiree healthcare action." (*Id.*);

- The use of "vague block billing entries" made it "impossible for the court to verify the reasonableness of the billing." (*Id.*); and

- "Plaintiffs have failed to demonstrate that the hours expended were reasonable, particularly in light of counsels' credentials and extensive experience with ERISA/LMRA retirement healthcare litigation." (*Id.* at Pg ID 6050-51).

Despite these findings, the District Court, without explanation, elected to reduce plaintiffs' requested attorneys' fees by only 10%. (Doc. 83, Pg ID 6050-51). The District Court erred by ordering such a small and unexplained reduction, particularly in light of its unambiguous findings of rampant overbilling and use of impermissible timekeeping. Thus, plaintiffs' counsels' fees should be significantly reduced, and certainly beyond a mere arbitrary reduction of 10%.

## A.    District Courts May Only Award Reasonable Fees.

Prevailing parties may only recover attorneys' fees that are reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "Though district courts have substantial discretion in determining the amount of an attorney fee award, it is also important that a 'concise but clear explanation of [their] reasons for the fee award' be given. 'A district court should state with some particularity which of the claimed hours the

court is rejecting, which it is accepting, and why.'" *Ky. Rest. Concepts Inc. v. City of Louisville*, 117 Fed. Appx. 415, 419 (6th Cir. Dec. 1, 2004) (internal citations omitted).

To determine whether fees are reasonable, Sixth Circuit courts use the "lodestar" approach, which determines fees based on the reasonable number of hours billed multiplied by a reasonable billing rate. *Paschal v. Flagstar Bank, FSB*, 297 F.3d 431, 434 (6th Cir. 2002). The reasonableness of hours (and hourly rate) is determined by considering the following twelve factors:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases.

*Isabel v. City of* Memphis, 404 F.3d 404, 415 (6th Cir. 2005). Courts have, and regularly exercise, the discretion to reduce what they determine to be an excessive number of attorney hours and/or hours that are not properly documented or explained. *See Tinch v. City of Dayton*, 199 F. Supp. 2d 758 (S.D. Ohio April 30, 2002). This reduction can be item-by-item and/or a blanket percentage reduction on all claimed hours. *Id.*; *see also Moore v. Menasha Corp.*, 2013 U.S. Dist. LEXIS 10126 (E.D. Mich. Jan. 25, 2013).

If this Court determines that an award of attorneys' fees resulted from an abuse of discretion, it may further reduce or adjust the amount awarded. *See Reed v. Country*

*Miss, Inc.*, 1995 U.S. App. LEXIS 14498 at *9-10 (6th Cir. June 5, 1995) (finding the District Court's fee reduction to be "patently insufficient" and ordering a further fee reduction). Here, the District Court's reduction of attorneys' fees by only 10% does not go far enough to identify and remove what it found to be excessive billings by Plaintiffs' counsel. It is, at best, a start.

###### B. The District Court Erred By Applying Only A 10% Reduction To The Attorney Hours Claimed By Class Counsel.

Given the District Court's unequivocal determination that class counsel was billing excessively, it is unknown why the District Court believed that reducing the requested fees by merely 10% would make them reasonable. A cursory look at the specific examples of excess provided by the court demonstrates that, even with the applied 10% reduction, the requested fees were far from reasonable:

- Counsel spent 199.75 hours preparing a brief opposing a Motion to Compel Arbitration, despite preparing a nearly identical brief in a parallel lawsuit. A reduction of these hours by 10% results in class counsel still spending 179.75 hours on a brief that is nearly identical to a brief filed in a parallel lawsuit.

- Counsel spent 353.25 hours briefing cross-motions for summary judgment, despite the fact that the governing law was identical to a brief they had submitted in a similar retiree healthcare action. A reduction of these hours by 10% results in class counsel still spending 317.925 hours (or the equivalent of two solid months) on cross-motions for summary judgment.

Moreover, these examples only constitute a portion of plaintiffs' counsel's impermissible fee requests. Despite being experts in retirement law, and also having worked with these collective bargaining agreements previously, plaintiffs' counsel

allegedly spent 110 hours, in other words, nearly three weeks, reviewing the relevant collective bargaining agreements. (Doc. 74-3, Pg ID 5439, Exhibit B to Defendants' Opposition to Motion For Attorneys' Fees – Summary of Requested Attorney Hours By Task). They also spent 110 hours briefing a motion for certification in the lower court, despite that brief being largely recycled from the certification briefing filed by Mr. Israel in *Hargrove v. Eaglepicher Corp.*, 2:10-cv-10946 (E.D. Mich.). (*Id.* at Pg ID 5441). As this Court has found, counsel of course may not collect fees for time spent drafting a brief in a prior lawsuit and recycling it in another case. *See Binta v. Gordon*, 2013 U.S. App. LEXIS 5432, at *631 (6th Cir. 2013). Plaintiffs also provided no explanation for why their lead counsel conducted basic legal research and initial drafting of documents. *J4 Promotions, Inc. v. Splash Dogs, LLC*, 2010 U.S. Dist. LEXIS 60590 at *18 (S.D. Ohio May 25, 2010) (court finding that party requesting fees must prove that they performed tasks in an economic fashion, including delegation of work to junior attorneys and paralegals).

Despite being faced with this overwhelming evidence of excess hours and improper block billing and agreeing that the fees were excessive in many respects, the District Court found (without explanation) that a 10% reduction in attorney hours would make the fees reasonable. (Doc. 83, Pg ID 6051). While the District Court was within its authority to order a blanket reduction of fees, it was required to explain why this reduction would make the fees reasonable and, therefore, recoverable. *See Ky. Rest. Concepts Inc.*, 117 Fed. Appx. at 419. As made clear by the District Court's

own opinion and examples, it did not and could not explain how the resulting reduction from 199.75 hours to 180 hours for preparing a duplicative opposition to a Motion to Compel or the reduction from 353.25 to 317 hours on a recycled summary judgment brief would suddenly be reasonable.

Therefore, the District Court abused its discretion and acted inconsistently with its own findings of billing excess and impropriety when it only reduced the fee award by 10%. Thus, if Court were to affirm the District Court's summary judgment ruling, it should exercise its authority and reduce the attorneys' fee award to $245,735. *See Reed*, 1995 U.S. App. LEXIS 14498 at *9-10. This reduction takes into account the following reductions from plaintiffs' original requested fee amount:

| Event | Hours Requested By Plaintiffs' Counsel | Hour Reduction | Total |
|---|---|---|---|
| Opposing defendants' motion to compel arbitration | 119.75 | 104.75 | 15 |
| Summary judgment briefing | 353.25 | 278.25 | 75 |
| Reviewing CBAs | 112 | 98 | 12 |
| Certification briefing | 110.75 | 85.75 | 25 |
| Responding to defendants' motion to strike | 38.75 | 30.75 | 8 |
| Time spent performing clerical tasks | 15.25 | 15.25 | 0 |
| | | **Total = 612.75** | |

56

(Doc. 74-2, Exhibit A to Defendants' Opposition to Motion For Attorneys' Fees –
Highlighted copy of Doc. 70-11 identifying disputed hours; Doc. 74-3, Pg ID  5435-
42, Exhibit B to Defendants' Opposition to Motion For Attorneys' Fees – Summary
of Requested Attorney Hours By Task).

A subtraction of 612.75 facially excessive hours from plaintiffs' requested
payment of 1,508.5 hours would reduce the fee award to approximately $351,050.
This amount should further be reduced by an additional 30%, for a total fee award of
**$245,735**, because, as the District Court found, plaintiffs' counsel's repeated use of
block billing and vague entries made it impossible to discern exactly what was done
and for how long; and they did not demonstrated that much of the legal research and
document review could not have been delegated to a junior attorney or
paralegal/clerk with a substantially lower hourly rate.  This reduced award would also
remedy the District Court's clear error of awarding plaintiffs 15.25 hours of time
spent on purely clerical tasks.  (*See* Doc. 83; Pg ID 6051; Doc. 74-3, Pg ID 5440).  "Of
course, purely clerical or secretarial tasks should not be billed at a paralegal rate,
regardless of who performs them."  *Missouri v. Jenkins*, 491 U.S. 274, 288 (1989);
*Williams v. Kentucky*, 1997 U.S. App. LEXIS 23939 at *43 (6th Cir. Sept. 9, 1997)
("Under *Missouri v. Jenkins*, purely clerical or secretarial tasks should not be billed at a
paralegal rate.").

A fee award of $245,735 would be more in line with similar instances of excess hours and use of block filling. For instance, in *Moore v. Menasha Corp.*, 2013 U.S. Dist. LEXIS 10126 (E.D. Mich. Jan. 25, 2013), the plaintiffs filed a supplemental motion for attorneys' fees after prevailing in an ERISA retiree benefit action. Mr. Israel, class counsel in this matter, was one of the plaintiffs' attorneys who sought recovery of his fees. The court found that much of the submitted time was excessive and unreasonable. *Id.* at *20. The court specifically noted that Mr. Israel billed 155.5 hours on a single appellate brief. (*Id.*). The court found that, even though the appellate brief was successful, "155.5 hours for a single appellate brief [is] excessive and unreasonable." *Id.* After also noting a lack of detail and use of block billing in plaintiffs' submitted attorneys' fees entries, the court reduced the fees by 30%.[5] *Id.* at *21.

Likewise, in *Grant v. Shaw Environmental, Inc.*, 2013 U.S Dist. LEXIS 49180 (E.D. Tenn. Jan 30, 2013), the court reduced all of the plaintiffs' attorneys' claimed recoverable hours by 30% to arrive at a "reasonable" number. Similarly, in *Tinch v. City of Dayton*, 199 F. Supp. 2d 758 (S.D. Ohio 2002), the court questioned the accuracy of plaintiffs' billing records when time was recorded for work that was

---

[5] The *Moore* court also noted that it believed it should have reduced the amount by more than 30%, but that the 30% reduction brought the award in alignment with what defendants' attorneys charged. *Id.* at *21, n. 8.

performed the previous year.  The court then reduced the requested fee amount by 30% as a result.  (*Id.*).

Thus, the District Court abused its discretion by finding, without explanation, that an overall 10% reduction in attorney hours made the requested award "reasonable" and, therefore, recoverable.

## XII.  <u>CONCLUSION</u>

Under the HRA structure, Kelsey-Hayes "contribute[d] the full premium or subscription charge for [the] health care coverages" described in the contract or, in other words, undertook to do everything the collective bargaining agreement arguably could have required of it.  It made available coverage that was at least equal to, and generally better than, the coverage described in the contract.  It contributed the full premium cost for that coverage, and more, and at its own expense hired an administrator to manage the program and to assist retirees in obtaining the coverage that best met their needs.  And the coverage they received was outstanding and at no cost to themselves as reflected by the fact that not a single retiree had to pay a single dime for their health care, including for expenses the contract never covered, during the entire eighteen months prior to the District Court's order.

The District Court erred by short-circuiting the litigation on collateral estoppel grounds and by not conducting the analysis *Reese II* required.  Had that analysis been undertaken, the reasonableness of the HRA program would not only have become apparent but undisputed.

59

Respectfully submitted,

s/ Gregory V. Mersol
GREGORY V. MERSOL (0030838)
GMERSOL@BAKERLAW.COM
TODD A. DAWSON (0070276)
TDAWSON@BAKERLAW.COM
BAKER & HOSTETLER LLP
3200 PNC Center
1900 East Ninth Street
Cleveland, Ohio 44114-3485
Telephone:    (216) 621-0200
Facsimile:    (216) 696-0740

*Attorneys for Defendants-Appellants*

## <u>FED. R. APP. 32(a)(7) CERTIFICATE OF COMPLIANCE</u>

Pursuant to FRAP 32(a)(7), I certify that the foregoing *Defendants-Appellants' Opening Brief* is proportionately spaced, has a typeface of 14 point and, based on the word count function of Microsoft Word, contains 13,174 words.


DATED: September 27, 2013          <u>s/ *Gregory V. Mersol*</u>
                                   GREGORY V. MERSOL
                                   BAKER & HOSTETLER, LLP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Gregory V. Mersol
One of the Attorneys for *Defendants/Appellants*

## ADDENDUM:  DESIGNATION OF THE RECORD

| RECORD ENTRY NO. | DESCRIPTION | Pg ID |
|---|---|---|
| 1 | Complaint | 1-15 |
| 13 | Motion to Compel Arbitration | 83-96 |
| 15 | Plaintiffs' Opposition to Motion to Compel Arbitration | 144-174 |
| 20 | Order Denying Motion to Compel Arbitration | 438-449 |
| 31 | Motion to Certify Class By All Plaintiffs | 492-520 |
| 36 | Response To Motion To Certify Class | 887-903 |
| 36-2 | Declaration of Shelly Iacobelli | 905-917 |
| 37 | Defendants' Motion for Summary Judgment | 1402-1430 |
| 37-2 | Declaration of Shelly Iacobelli | 1432-1445 |
| 37-8 | Supplement C and Supplement C-1 | 1871-1925 |
| 37-9 | Plant Shutdown Agreement | 1926-1934 |
| 37-10 | Deposition of Ronald Strait | 1935-1967 |
| 37-11 | Deposition of Danny O. Stevens | 1968-1986 |
| 37-16 | 2011 Open Enrollment Form | 2021-2040 |
| 37-17 | Medicare Claim Form | 2041-2043 |
| 39-19 | 2012 New Coverage New Choices Booklet | 2669-2681 |
| 47 | Plaintiffs' Motion for Summary Judgment | 3041-3089 |
| 54 | Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3902-3932 |
| 58 | Opinion and Order Granting Plaintiffs' Motion for Class Certification | 4580-4589 |
| 65 | Opinion and Order | 4987-5004 |
| 69 | Motion for Permanent Injunction | 5017-5025 |
| 70 | Motion for Attorney Fees | 5033-5065 |
| 70-11 | Exhibit J to Plaintiffs' Motion for Attorneys' Fees – Time Entries of Requested Hours and Fees | 5123-5159 |
| 74-2 | Exhibit A to Defendants' Opposition to Motion For Attorneys' Fees – Highlighted | 5399-5434 |

| | | |
|---|---|---|
| | copy of Doc. 70-11 identifying disputed hours | |
| 74-3 | Exhibit B to Defendants' Opposition to Motion For Attorneys' Fees – Summary of Requested Attorney Hours By Task | 5435-5442 |
| 75 | Opposition to Motion for Permanent Injunction | 5603-5614 |
| 76 | Response to Motion for Attorney Fees | 5615-5633 |
| 77 | Response to Motion for Permanent Injunction | 5839-5850 |
| 80 | Appeal | 6032-6034 |
| 82 | Order Granting Motion for Permanent Injunction | 6036-6044 |
| 83 | Order Granting In Part Plaintiffs' Motion for Attorney Fees | 6045-6052 |
| 84 | Amended Appeal | 6053-6056 |